Nott, Ch. J.,
delivered the opinion of the court:
The ultimate facts of the case are these:
1. The officers of the Quartermaster’s Department entered into an agreement with the claimant for the sale and delivery of hay. “The estimated quantity” was 9,000,000 pounds. The quantity might “be increased or decreased at the option of the United States, not exceeding 20 per centum thereof.” Should “the troops be wholty or in part withdrawn” from the camp at Chickamauga Park, “the award” — that is to say, the agreement — was to “ become inoperative to the extent of such reduction.” Deliveries were to begin within five days “and proceed at daity rates of at least one-sixtieth of amount, or in such quantities and at such times afterwards as may be designated by the chief quartermaster or his authorized representative.” In case of failure “to furnish and deliver the supplies ” the contractor was to “be charged with all expense resulting from such failure.”
2. Under and in pursuance of this agreement the officers of *289 the Quartermaster’s Department called for. and the claimant delivered 4,685,949 pounds of hay between the 12th of July and the 28th of August, 1898; that is to say, within the first forty-seven days after the agreement went into effect. The depot quartermaster — i. e., the ofhc.'r charged with the business at the camp — then stopped further deliveries; the claimant, by its officers, remonstrated against this. Fifteen days later, on the 12th of September, the quartermaster in charge resumed issuing orders for the delivery of hay, but in relatively small quantities; and these orders continued until June, 1899, so that between September 12,1898, and June 13, 1899, the claimant ivas required to deliver, and did deliver, 3,814,490 pounds. The claimant remonstrated against being compelled so to deliver, and represented that the price of hay had seriously risen, and that the change of delivery from summer and autumn to winter and spring greatly increased the freight charges upon the hajT, which were to be borne by the claimant. Nevertheless the officer in charge compelled the claimant to deliver when called upon. This compulsion consisted in ■withholding money due for hay and threatening to purchase in the .open market at the cost of the contractor. The suspension of orders for the delivery of haj" and the diminished and protracted orders for delivery given by the depot quartermaster in charge were consequent to the removal of troops from the camp at Chickamauga Park and the decreased number of animals there requiring forage.
3. The agreement before referred to consisted of the advertisement of the chief quartermaster of Camp George H. Thomas, at Chickamauga Park, where the hay was to be delivered, of the proposals of the contractor and the acceptance of the proposals by the chief quartermaster. Beyond this the agreement was never reduced to writing and signed by the contracting parties, as prescribed by Revised Statutes, section 3744.
4. The claimant remonstrated against the suspension of deliveries in August, 1898, and against being compelled to deliver, as before set forth, after the price of hay had risen and the purchase of hay could not be made in the country, but had to be made in St. Louis, throwing upon it additional cost and increased freight charges, but did not treat the con *290 tract as rescinded or refuse to deliver. Payments for all deliveries were made bj^ the officers of the Quartermaster’s Department upon the usual' vouchers as for hay delivered under the agreement, and the claimant receipted therefor without protest or reservation made at the time of payment. The losses suffered by the claimant upon hay delivered after the 12th of September, 1898, exceeded the price it received by 17,869.
As to the agreement, which is relied upon by the claimant, its intent and moaning do not seem as clear to the court as to the claimant’s counsel. Deliveries were to begin within five days, and ‘ ‘ proceed at daily rates of at least one-sixtieth of the amount, or in such quantities and at such times afterwards as may be designated by the chief quartermaster or his authorized representative.” The provision that deliveries wore “to begin within five days from date of award and proceed at daily rates of at least one-sixtieth of the total amount,” standing by itself, would cast a reciprocal obligation upon the defendants to receive one-sixtieth daily if tendered, under the decision of the Supreme Court in Speed's Case (8 Wall., 77). But this clause is qualified immediately by the words “in such quantities and at such times as may be designated by the chief quatermaster or his authorized representative.” Furthermore, the agreement previously provides that “if the troops shall be wholly or in part withdrawn the award shall become inoperative to the extent of such reduction.” The troops were withdrawn. Did the agreement become “inoperative to the extent of such reduction,” i. e., was the total quantity of 9,000,000 pounds of hay to be reduced in proportion to the diminishing number of animals remaining in the camp, and were the deliveries to be daily until the reduced total of the hay was delivered, or had the quartermaster the right to hold the claimant for the full amount of 9,000,000 pounds and stretch the period for deliveries over many months? In a word, did the claimant agree to deliver as much hay as might be required within a reasonable time, or bind itself to furnish 9,000,000 pounds of hay at Chickamauga Park as slowly or rapidly as the military exigencies there might require and take the. chances of its contract extending1 over the whole period of the war?
*291 As to the agreement itself, the court is constrained to hold, under the leading case of Clark v. United States (95 U. S. R., 539), and many decisions since, that the transaction between the parties was not a purchase in open market under the pressure of a military exigency, and that the agreement not being-in writing and signed by the parties, as required by the Revised Statutes, section 3714, was not a valid contract upon which an action can be brought for damages caused by the defendant’s breach.
As to the right of the claimant to recover, irrespective of the express contract, what the hay was actually worth at the time and place of delivery, the court is again constrained to hold that the claimant can not recover. It is true that, under the authority cited, a party whose contract is for this statutory reason invalid and void may recover in quantum meruit; and it is true that, where there is an express valid contract, payment by a debtor of a part of his debt is not satisfaction of the whole, even though a receipt in full be given. (United States v. Bostwick, 94 U. S. R., 53.) But nevertheless it has been uniformly held by this court since Kirkham & Brown (4 C. Cls. R., 223) in cases of implied contract where the recovery will be in qumitum meruit and the price to be paid is undetermined by agreement that, where the defendant has paid and the contractor has accepted a price as payment in full, it closes the transaction, and the contractor can not come in and be allowed to allege that his goods were worth more than the price which he consented to take for them. (Comstock's Case, 9 C. Cls. R., 141.) Acceptance of a smaller sum than the one claimed does not leave the defendants open to further claim, if the acceptance of the smaller sum was voluntary, without intimidation, and with full knowledge of all the circumstances. (Savage v. United States, 92 U. S. R., 382.)
The counsel for the claimant has warmly pressed upon the court the fact that the failure to reduce the contract to writing, as required by the statute, ivas the failure and default of the officers of the Government; that the claimant did everything in its power to make a complete and valid agreement, and that the defense which would preclude a party from recovering damages upon the contract if it was valid, or in quantum meruit if it was invalid, is grossly inequitable.
*292 It must be acknowledged that this case belongs to that class which has been termed by many courts “ hard cases,” and that the hardness of it was caused by officers of the Government neglecting their statutory duty (Revised Statutes, sec. 3746), and that the claimant being ignorant of the law might well rely upon the officers of the Government to reduce the contract to a legal form.
The court is aware that citizens of the United States transact their business generally under State laws, and are not familiar with acts of Congress, and might well rely in such matters upon the knowledge and good faith of the officers of the Government. But these facts can not validate that which is declared by statute to be invalid. Ignorance of law does not change the law.
The judgment of the court is that the petition be dismissed.